UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

WORK CAT FLORIDA, LLC                         Case No. 8:21-bk-02588-CPM
WORK CAT TRANS GULF, LLC                  Chapter 7

      Debtor.
_____/

DOUGLAS N. MENCHISE, a
Chapter 7 Trustee,

      Plaintiff,

v.                                                              Adversary No.:

OFFSHORE TOWING, INC.,

      Defendant.
_____/

## ADVERSARY COMPLAINT

Plaintiff, Douglas M. Menchise, as Chapter 7 Trustee (the "Trustee") of the bankruptcy estate of Work Cat Florida, LLC, f/k/a Work Cat Trans Gulf, LLC ("Debtor"), by and through the undersigned counsel, hereby sues Offshore Towing, Inc. ("OTI"), and states:

### I.      NATURE OF ACTION

1.     This is an adversary complaint objecting to claim(s), seeking avoidance and recovery of certain preferential transfers, seeking declaratory relief, damages and disallowance of Defendant's pre-petition unsecured claim for the benefit of the Estate.

## II.    JURISDICTION AND VENUE

2.      This is an adversary proceeding brought pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), §§ 105(a), 502, 541, 547, 548, and 550 of the Bankruptcy Code, seeking to avoid and recovery of certain preferential transfers, declaratory relief, disallowance of Defendant's administrative claim, and other relief for the benefit of the Estate and lawful creditors.

3.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b).

4.      The Debtor's bankruptcy case remains pending before this Court and thus venue is proper pursuant to 28 U.S.C. § 1409(a).

5.      The Defendant is a party in interest in this bankruptcy case and claims to be a pre-petition creditor.

6.      The dispute is a "core" proceeding within the meaning of 28 U.S.C. § 157(b), and the Court may enter final orders for the matters contained herein.

7.      To the extent that any claim or cause of action, asserted herein, constitutes a non-core proceeding and/or if this Court lacks Constitutional authority to enter a final judgment on any claim or cause of action, asserted herein, the Trustee hereby consents to the entry of final orders and judgment by the Bankruptcy Court pursuant to Bankruptcy Rule 7008.

### III.   PRELIMINARY STATEMENT

8.     The Debtor, Work Cat Florida, LLC, f/k/a Work Cat Trans Gulf, LLC, filed a petition for bankruptcy relief under Chapter 11 on May 18, 2021 (the "Petition Date") [Dkt. 1].

9.     On June 17, 2021, this Court entered an Order Converting Case from Chapter 11 to Chapter 7 Case. [Dkt. 87].

10.    The Trustee brings this action for negligent misrepresentation, fraudulent misrepresentation, breach of contract, negligence, avoidance and recovery of various transfers and disallowance of a pre-petition claim all pursuant to applicable non-bankruptcy law and sections 502, 547, 548 and 550 of the of Title 11 of the United States Code ("Bankruptcy Code") against Offshore Towing, Inc.

### IV.   PARTIES

11.    The Plaintiff in this adversary proceeding is the Trustee duly appointed by this Court on June 17, 2021 (Doc. 100) over the Debtor's Bankruptcy Estate (the "Estate"). Consequently, the Trustee has standing to pursue all claims sand causes of action belonging to the Debtor and on behalf of the Estate.

12.    The Debtor, Work Cat Florida LLC f/k/a Work Cat Trans Gulf, LLC ("Debtor"), is a limited liability corporation incorporated under the laws of the State of Florida having its principal place of business in Tampa, Florida.

13.    Offshore Towing, Inc. ("OTI"), did business with the Debtor before the filing of the Petition, filed a pre-petition proof of claim in the amount of $1,118,961.45, Claim

No. 7 ("OTI Claim"), and has submitted itself to the jurisdiction of this Court by filing its OTI Claim in this case.

14.     The Debtor has, at all relevant times, conducted business in Florida and had its principal place of business in Florida.

## V.     FACTUAL BACKGROUND

15.     On or about June 25, 2018, Kelly Falgout, the CEO of OTI, solicited Chris Raley, CEO and Managing Member of Debtor, to introduce himself in the event that Debtor had any prospective opportunities for the use of tug vessels in Florida.

16.     Representatives of OTI and the Debtor stayed in contact through the remainder of 2018, 2019 and into February 2020, though no agreements between them had been entered, as Debtor had not actually started its business operations yet.

17.     On or about May 2020, the Debtor contacted a broker, Compass Marine, seeking the services of a company to provide tugs for the transportation of barges chartered by Debtor between Brownsville, Texas and Tampa, Florida.

18.     Compass Marine gave Debtor a list of companies who performed such work, one of which was OTI.

19.     On or about June 2020, the Debtor entered into discussions with a number of the companies on the list provided by Compass Marine, which included starting back up negotiations with OTI.

20.     In these discussions with OTI and these other companies, the Debtor made it a priority to discuss with each company the prudent use of assist tugs, and let all of the

companies, including OTI, know the importance that the Debtor would, no matter whatever company would be selected to do this work, only employ assist tugs in situations where it was reasonably necessary to use them in the interest of safety.

21.   OTI, through its representative and primary contact Kelly Falgout, represented and made clear to Debtor in these discussions that OTI would use assist tugs only in times of absolute need (the "First Assist Tugs Representation").

22.   Also in these discussions, OTI, through its representative and primary contact Kelly Falgout, represented to the Debtor that it had prior experience pushing the exact barges the Debtor chartered and, in so doing, knew that its tugs would consume 3,000 gallons of fuel per day for barges with light loads of cargo and 3,600 for barges with full loads of cargo (the "Fuel Use Representation").

23.   As a result of these discussions and representations, the Debtor entered into a Master Charter Agreement on June 23, 2020 with OTI, whereby OTI agreed to charter tug boat vessels to Debtor for the transportation of barges chartered by Debtor, attached hereto as **Exhibit A** (the "Charter Agreement").

24.   The Charter Agreement provides in ARTICLE 5 - USE OF VESSEL:

> **...the master**, although appointed by the OWNER, **shall be _under the general directions_ of the CHARTERER as regards to employment of the vessel, agencies, or other arrangements, and** _shall not unreasonably refuse_ **any request to undertake operations or carry out any order or direction specified by CHARTERER...**

25.     After the Charter Agreement was entered into, the Debtor learned OTI was, contrary to their prior representations, employing the use of assist tugs on voyages where such tugs were unnecessary.

26.     When Debtor made inquiries into this use of assist tugs, OTI asserted that the assist tugs were used in those instances because it was their first time into port, and they would not need or be required to use the assist tugs in the future and would wane off the use of the assist tugs going forward (the "Second Assist Tugs Representation").

27.     Notwithstanding their Second Assist Tug Representation, OTI continued to use assist tugs on all of the voyages undertaken on behalf of Debtor.

28.     Pursuant to Article 5 of the Charter Agreement, the Debtor repeatedly directed the master of OTI's vessels to reduce the amount of assist tugs used and only employ assist tugs when necessary; and the Debtor also requested OTI reinforce these directions with its employees.

29.     In response to the requests made by Debtor, OTI repeatedly and continually represented that it would advise its employees to reduce the use of assist tugs to only when necessary (the "Third Assist Tug Representation").

30.     OTI and its employees refused to comply with these repeated requests and directions, and instead continued to use assist tugs excessively throughout the term of the Charter Agreement.

31.     Not only were the assist tugs used excessively, but there were several instances where a trailing tug would not even be connected to the barge and was therefore providing no assistance on the voyage other than increasing costs to the Debtor.

32.     Toward the end of Debtor's contractual relationship with OTI, OTI disclosed for the first time that, notwithstanding their Representations to the contrary (as defined below),  their parent company had a long-standing policy for OTI use assist tugs in every entry and exit voyage undertaken by the company, whether or not necessary.

33.     Upon information and belief, this requirement was known by OTI at the time both of its Representations (described above and defined below) and at the time the Debtor entered into discussions for this work.

34.     Had the Debtor known of this policy, the Debtor would have chosen another tug boat company to perform the work when the negotiations occurred during and prior to 2020.

35.     In addition to the Debtor's dissatisfaction with OTI's use of assist tugs, the two vessels provided by OTI pursuant to the Charter Agreement, Mr. Jonah and Wilkin A. Falgout (the "Vessels"), averaged 3,312 gallons of fuel per day - with some voyages getting as high as 4,700 to 4,400 gallons per day - which substantially differed from the Fuel Use Representations made by OTI in its initial discussions with Debtor.

36.     As a result of these actions by OTI and pursuant to ARTICLE 1 of the Charter Agreement, the Debtor sent OTI a Notice of Cancellation of Charter Agreement to terminate the Charter Agreement on December 7, 2020.

37.     The Debtor incurred costs related to OTI's unauthorized use of assist tugs through November 2020 for the Port of Brownsville in at least the amount of $278,745.00 and for the Port of Tampa in at least the amount of $127,924.00.

38.     OTI's unauthorized use of assist tugs against the Debtor's express request, that OTI refrain from doing so, has caused Debtor to incur significant damages.

### Transfers Made by the Debtor to OTI

39.     Prior to the Petition Date, the Debtor maintained business relationships with various business entities and individuals, through which Debtor regularly purchased, sold, received, and/or delivered goods and services.

40.     During the ninety (90) days before and including the Petition Date, between Ferbruary 17, 2021 and May 18, 2021, prior to the filing of the Debtor's Chapter 11 Petition (the "Preference Period"), the Debtor continued to operate its business, including the transfer of money either by checks, cashier checks, wire transfers, ACH transfers, credit card payments, direct deposits, or otherwise to various entities.

41.     Upon information and belief, during the course of their relationship, OTI and the Debtor entered into the Charter Agreement for the provision of various services by OTI to the Debtor.

42.     Upon further information and belief, the Charter Agreement concerned and related to the services provided by OTI to the Debtor.

43.     The Debtor's payments were made to OTI, on account of obligations the Debtor owed to the OTI, during the Preference Period, as are set forth on the Statement of Account, which is attached hereto and incorporated by reference as **Exhibit B**.  Such details include "Date Paid", "Amount Paid", "Account Paid Through", and "Payment Method".

44.     Specifically, the Debtor made the following payments to OTI within the Preference Period:

    a.  $28,000.00 on February 18, 2021.

    b.  $17,940.00 on March 6, 2021.

    c.  $24,443.00 on March 18, 2021.

45.     The Trustee seeks to avoid all transfers of an interest of Debtor's property made to OTI, on account of antecedent debts owed to OTI, and paid to the OTI within the Preference Period.

46.     The Debtor made a transfer(s) of an interest, in its property, to or for the benefit of the OTI, during the Preference Period, through payments aggregating no less than the amount set forth on Exhibit B hereto (the "Transfer" or "Transfers").  The details of each Transfer are set forth on Exhibit B, attached hereto and incorporated by reference.

47.     Additionally, since the execution of the Charter Agreement, the Debtor did not receive reasonably equivalent value for the payments the Debtor made to OTI, for services rendered by OTI, by OTI's unauthorized use of assist tugs and misrepresentations made by OTI in negotiations and throughout performance of the Charter Agreement.

48.     Specifically, the Debtor was overcharged by OTI and overpaid OTI in excess of $406,669.00 (the "Overpayments"), to OTI for unauthorized use of assist tugs pursuant to the Charter Agreement, and inflated charges for fuel usage during actual performance under the Charter Agreement.

49.     The Overpayments were made by the Debtor based on material misrepresentations made by OTI, and are subject to avoidance under the Bankruptcy Code.

50.    All of such payments made during the Preference Period are avoidable pursuant to 11 U.S.C. §547 and such Overpayments are avoidable pursuant to 11 U.S.C. §548.

## COUNT I - NEGLIGENT MISREPRESENTATION

51.    The Trustee realleges and incorporates the allegations in paragraphs 1 through 50 as if fully set forth herein.

52.    The Fuel Use Representation, First Assist Tug Representation, Second Assist Tug Representation, and Third Assist Tug Representations (collectively the "Representations") were materially false and misleading for the reasons detailed in Paragraphs 1-50 above.

53.    OTI failed to exercise reasonable care in gathering the information that it used when making the Representations.

54.    OTI made the Representations with the intent of inducing the Debtor to enter into the Charter Agreement with OTI and to induce the Debtor to refrain from terminating the Charter Agreement at various points.

55.    The Debtor relied on the Representations in connection with its decision to enter into the Charter Agreement and in its decisions to refrain from terminating the Charter Agreement at various points.

56.    As a direct and proximate result of the Debtor's reliance on the Representations, the Debtor suffered damages.

WHEREFORE, Trustee respectfully requests this Court to enter judgment in its favor against Offshore Towing, Inc., and award the Trustee his damages, costs, interest thereon, and such other and further relief as the Court deems just and appropriate.

## COUNT II – FRAUDULENT MISREPRESENTATION

57.     The Trustee realleges and incorporates the allegations in Paragraphs 1 through 50 above as if fully set forth herein.

58.     OTI knew the Representations were materially false or misleading at the time each representation was made; or at the very least, at the time OTI made each representation, it had an insufficient basis for doing so.

59.     OTI made the Representations with the intent of inducing the Debtor to enter into the Charter Agreement with OTI and with the intent of inducing the Debtor to refrain from terminating the Charter Agreement at various points.

60.     At the time OTI made each of the Representations, it knew that the Debtor would rely on the representations and intended the Debtor to rely on the Representations.

61.     Debtor relied upon the Representations in connection with its decision to enter into the Charter Agreement and its decision to refrain from terminating the Charter Agreement at various points.

62.     As a direct and proximate result of Debtor's reliance on the Representations, the Debtor suffered damages.

WHEREFORE, Trustee respectfully requests this Court to enter judgment in its favor against Offshore Towing, Inc., and award the Trustee his damages, costs, interest thereon, and such other and further relief as the Court deems just and appropriate.

## COUNT III - BREACH OF CONTRACT

63.     The Trustee hereby realleges and incorporates the allegations in Paragraphs 1 through 50 above as if fully set forth herein.

64.     The Debtor fully performed its duties and obligations under the Charter Agreement with OTI.

65.     ARTICLE 5 of the Charter Agreement gave the Debtor the authority to direct the manner and means of performance of OTI's employees that were operating the vessels transporting the barges chartered by the Debtor.

66.     Despite the Debtor's direction and repeated requests that OTI employ assist tugs only when necessary, OTI refused such directions and excessively used assist tugs throughout the term of the Charter Agreement in direct violation of ARTICLE 5.

67.     In addition to this refusal to follow directions, OTI calculated charges for fuel that were substantially excessive to the Fuel Use Representation, and actual cost incurred for fuel used during any particular voyage.

68.     As a direct and proximate result of these breaches by OTI, the Debtor incurred substantial and unnecessary charges, causing the Debtor damages.

WHEREFORE, the Trustee respectfully requests this Court to enter judgment in his favor against Offshore Towing, Inc., and award the Trustee his damages, costs, interest thereon, and such other and further relief as the Court deems just and appropriate.

## COUNT IV - BREACH OF IMPLIED WARRANTY OF WORKMANLIKE PERFORMANCE

69.     The Trustee hereby realleges and incorporates the allegations in Paragraphs 1 through 50 above as if fully set forth herein.

70.     ARTICLE 3 of the Charter Agreement required OTI to exercise "due diligence" to see that the tug vessels are "delivered and maintained in good running order and in a seaworthy condition..."

71.     ARTICLE 7 of the Charter Agreement provided that OTI was to provide a master and crew for each tug vessel, and also provided that the master "shall prosecute the voyage with dispatch and shall render all reasonable assistance with the vessel's crew and equipment. "

72.     On multiple occasions, OTI's employees breached these contractual duties contained in the Charter Agreement, the duty to exercise reasonable care, and also breached the implied warranty of workmanlike performance by including but not limited to dropping the chain bridle for a barge, as well as causing a vessel to run into a wharf.

73.     As a direct and proximate result of these negligent actions of OTI, the Debtor suffered damages.

WHEREFORE, Trustee respectfully requests this Court to enter judgment in its favor against Offshore Towing, Inc., and award the Trustee his damages, costs, interest thereon, and such other and further relief as the Court deems just and appropriate.

## COUNT V – AVOIDANCE OF PREFERENTIAL TRANSFERS UNDER § 547

74.     The Trustee realleges and incorporates the allegations in Paragraphs 1 through 50 above as if fully set forth herein.

75.     This is an action to avoid preferential transfers pursuant to 11 U.S.C. § 547.

76.     As described herein, during the Preference Period, the Debtor made Preferential Transfers to or for the benefit of OTI in an aggregate amount of not less than $70,383.00, as detailed by the amount set forth below and on Exhibit B attached hereto:

   a.  02/18/2021 for $28,000.00.

   b.  03/06/2021 for $17,940.00.

   c.  03/18/2021 for $24,443.00.

77.     The Preferential Transfers constituted transfers of property of the Debtor.

78.     During the Preference Period, OTI was a creditor at the time of each of the Preferential Transfers by virtue of having supplied the Debtor with services supposedly pursuant to the parties Charter Agreement, for which the Debtor was arguably obligated to pay.

79.     Each of the Preferential Transfers was to or for the benefit of a creditor, namely OTI, within the meaning of §547(b)(1) of the Bankruptcy Code, because each of the Preferential Transfers either reduced or fully satisfied a debt or debts then owed by the Debtor, as described herein.

80.     Each of the Preferential Transfers were made for, or on account of, an antecedent debt or debts allegedly owed by the Debtor to OTI then in existence before such Preferential Transfers were made.

81.     Each of the Preferential Transfers were made while the Debtor was insolvent. The Trustee is entitled to the presumption of insolvency for any transfer made during the Preference Period pursuant to § 547(f) of the Bankruptcy Code.

82.     Each of the transfers at issue *sub judice* were made during the Preference Period.

83.     As a result of each of the Preferential Transfers, OTI received more than OTI would have received if the transfers had not been made.

84.     In accordance with the foregoing, each of the Preferential Transfers is avoidable pursuant to § 547(b) of the Bankruptcy Code.

85.     OTI was the initial transferee of the Preferential Transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Preferential Transfers were made.

WHEREFORE, Trustee respectfully requests this Court enter an order  avoiding the Preferential Transfers under § 547(b) of the Bankruptcy Code, together with pre and post-judgment interest thereon as available and costs, and for such other relief as is just and necessary.

## COUNT VI – AVOIDANCE OF FRAUDULENT TRANSFERS UNDER § 548

86.     The Trustee realleges and incorporates the allegations in Paragraphs 1 through 50 above as if fully set forth herein.

87.     To the extent either: (i) one or more of the Transfers was not made on account of an antecedent debt, or was a prepayment for goods and/or services subsequently received, or (ii) to the extent the Debtor paid OTI for services it should not have billed consistent with the Representations and the Charter Agreement, the Trustee additionally pleads that the Debtor did not receive reasonably equivalent value in exchange for such transfer(s) (the "Potentially Fraudulent Transfers"); and

    a.  The Debtor was insolvent as of the date of the Transfer(s), or became insolvent as a result of the Transfer(s); or

    b.  The Debtor was engaged, or about to engage, in business or a transaction for which any property remaining with Debtor or for whose benefit the Transfer(s) was (were) made was an unreasonably small capital; or

    c.  The Debtor intended to incur, or believed it would incur, debts beyond its ability to pay upon maturity.

88.     The Potentially Fraudulent Transfers consisted of overpayments related to OTI's unauthorized use of assist tugs through November 2020 for the Port of Brownsville in the amount of $278,745.00 and for the Port of Tampa in the amount of $127,924.00, totaling no less than $406,669.00.

89.     Additionally, OTI knew that the Potentially Fraudulent Transfers were based on material misrepresentations made by OTI throughout the negotiation and execution of the Charter Agreement.

90.     OTI intended for the Debtor to rely on such misrepresentations, in order to induce the Debtor to engage in the agreement and, after Debtor objected to such OTI's actions in performance of the agreement, in order to keep Debtor from terminating the Charter Agreement.

91.     All Potentially Fraudulent Transfers occurred within the last two years, as the Charter Agreement was executed on June 23, 2020, and therefore the transfers are within the purview of § 548 of the Bankruptcy Code.

92.     Such Potentially Fraudulent Transfers are subject to avoidance under §548 of the Bankruptcy Code, and are therefore avoidable.

93.     Based upon the foregoing, the Potentially Fraudulent Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(B).

WHEREFORE, the Trustee respectfully requests this Court enter an order  avoiding the Potentially Fraudulent Transfers under § 548 of the Bankruptcy Code, together with pre and post-judgment interest thereon as available and costs, and for such other relief as is just and necessary.

## COUNT VII – RECOVERY OF AVOIDED TRANSFERS UNDER § 550

94.     The Trustee realleges and incorporates the allegations in Paragraphs 1 through 50 above as if fully set forth herein.

95.     The Trustee is entitled to avoid the Preferential Transfers under § 547(b) of the Bankruptcy Code and/or any Potentially Fraudulent Transfers under § 548 of the Bankruptcy Code (collectively, the "Avoidable Transfer(s)").

96.     Defendant OTI was the initial transferee of the Avoidable Transfer(s) or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Avoidable Transfer(s) were made.

97.     Pursuant to 11 U.S.C. § 550(a), the Trustee is entitled to recover from Defendant the Avoidable Transfer(s), plus interest thereon to the date of payment and the costs of this action.

WHEREFORE,  Trustee respectfully requests this Court enter an order  allowing the Trustee to recover the either the Avoidable Transfer(s) or their value under § 550(a) of the Bankruptcy Code, together with pre and post-judgment interest thereon as available and costs, and for such other relief as is just and necessary.

## COUNT VIII – DISALLOWANCE OF ALL CLAIMS UNDER § 502

98.    The Trustee realleges and incorporates the allegations in Paragraphs 1 through 50 above as if fully set forth herein.

99.    OTI is an entity from which property or the value of such property is recoverable pursuant to § 550 of the Bankruptcy Code.

100.    OTI is a transferee of the Avoidable Transfers avoidable under §§547 and 548 of the Bankruptcy Code.

101.    OTI has not repaid the Trustee amount of the Avoidable Transfers, or turned over such property, for which OTI is liable under § 550(a) of the Bankruptcy Code.

102.    Pursuant to § 502(d) of the Bankruptcy Code, any and all claims of OTI and/or its assignee, and all other scheduled, liquidated, non-contigent and undisputed claims scheduled by the Debtor, must be disallowed until such time as OTI repays to the Debtor an amount equal to the aggregate amount of the Avoidable Transfers, plus interest thereon and costs.

103.    Pursuant to § 502(j) of the Bankruptcy Code, any and all claims of OTI and/or its assignee, against the Debtor's Estate or Trustee previously allowed by Debtor or Trustee, must be reconsidered and disallowed until such time as Defendant pays to Plaintiff an amount equal to the aggregate amount of the Avoidable Transfers.

104.    Accordingly, 11 U.S.C. § 502 allows the Trustee to disallow any and all proofs of claim, and all other scheduled, liquidated, non-contingent, and undisputed claims, until such time as OTI repays to the Trustee an amount equal to the aggregate amount of the Avoidable Transfers, plus interest thereon and costs.

WHEREFORE, the Trustee respectfully requests this Court disallow OTI's claim(s), including all other scheduled, liquidated, non-contingent, and undisputed claims, and for such other relief as is just and necessary.

Respectfully submitted,

Date:  June 17, 2022.

**SHUMAKER, LOOP & KENDRICK, LLP**
*/s/ Steven M Berman*
**STEVEN M. BERMAN, ESQUIRE**
Florida Bar No.: 856290
Primary E-Mail:
sberman@shumaker.com
101 E. Kennedy Blvd., Suite 2800
Tampa, Florida 33602
Phone (813) 229-7600
Facsimile (813) 229-1660
*Counsel for Trustee Douglas N. Menchise, Ch. 7 Trustee*

**Turkel Cuva Barrios, P.A.**
*/s/ Anthony J. Cuva*
**ANTHONY J. CUVA, ESQUIRE**
Florida Bar No.: 896251
Primary E-Mail: cuva@tcb-law.com

*/s/ Anthony J. Severino*
**ANTHONY J. SEVERINO, ESQUIRE**
Florida Bar No.: 93452
Primary E-Mail: aseverino@tcb-law.com
101 N. Tampa Street, Suite 1900
Tampa, Florida 33602
Phone (813) 834-9191
*Counsel for Trustee Douglas N. Menchise, Ch. 7 Trustee*

# Exhibit A

# MASTER TIME CHARTER AGREEMENT

**This Master Time Charter Agreement entered into on** June 23, 2020 between Offshore Towing, Inc., its subsidiary and affiliated companies, including but not limited to Global Towing Service, LLC, (hereinafter referred to as 'OWNER'), and Work Cat Trans Gulf, LLC hereinafter referred to as "CHARTERER"),

## WITNESSETH:

WHEREAS, CHARTERER, from time to time, desires to Time Charter vessels from OWNER; and

WHEREAS, OWNER has various vessels available for charter which it, from time to time, desires to Time Charter to CHARTERER;

NOW, THEREFORE, in consideration of the premises and the covenants herein contained, the parties hereto mutually agree as follows:

## ARTICLE I - CANCELLATION

This Master Time Charter Agreement ("Master Agreement") shall control and govern each Short Form Time Charter Agreement ("Short Form", attached hereto as Exhibit "A") entered into between CHARTERER and OWNER which incorporates this Master Agreement by reference. Each party may cancel the Master Agreement upon the giving of thirty (30) days prior written notice to the other, provided, however, that any unexpired Short Form shall continue in effect subject to the terms and conditions hereof until expiration of the term specified in such Short Form,

## ARTICLE 2 - CHARTER

This Master Agreement does not obligate OWNER to charter its vessels to CHARTERER, nor does it obligate CHARTERER to hire any vessel or vessels from OWNER, but it, together with any Short Form between OWNER and CHARTERER dated subsequent to the date hereof shall govern the respective rights and duties of OWNER and CHARTERER.

## ARTICLE 3 - DELIVERY, REDELIVERY, SUBSTITUTION AND VESSEL CONDITION

Each vessel shall be delivered to CHARTERER at the time and place specified in the applicable Short Form. OWNER shall exercise due diligence to see that the vessel is delivered and maintained in good running order and in a seaworthy condition pursuant to the requirements of the attached Short Form. The vessel shall have valid documentation as required by the American Bureau of Shipping and United States Coast Guard, as applicable.

OWNER may at any time substitute a suitable replacement vessel, provided such substituted vessel is acceptable to CHARTERER or its underwriters' surveyors.

Redelivery may be postponed for the duration of any voyage or operation in progress at the expiration of the Short Form term and for any additional period reasonably necessary to affect redelivery. CHARTERER shall pay charter hire, at the applicable Short Form rate, for the entire period that redelivery is postponed or delayed.

Unless otherwise stipulated in the applicable Short Form EXHIBIT A, CHARTERER shall provide or pay for all fuel, lubricants and water consumed by the vessel during the term of the charter. Quantities of fuel, lubricants and water on board the vessel shall be determined by the respective on and off-hire surveys at the ports of delivery and redelivery. The prices for said fuel, lubricants and water shall be at the prevailing price at the respective port of delivery and redelivery.

## ARTICLE 4 - CHARTER HIRE

OWNER shall bill CHARTERER for each Short Form at the address specified in Paragraph 25 hereunder, or such other address as CHARTERER may from time to time designate in writing, at the fifteenth (15th) of each month, and/or at the end of each calendar month. CHARTERER shall pay OWNER within sixty (60) days after the date of OWNER'S invoice or as stated in the EXHIBIT A, if payment terms are different from above. Payment shall be made in U.S Dollars to

Rev. Date:  05/03/10

OWNER, or its assigns, at either the address specified in Article 23 hereunder or such other place as OWNER may designate in writing. Charterer owes one and one half percent (1-1/2%) interest per month on all amounts not paid within 90 days of the invoice date. If OWNER retains counsel to collect overdue invoices or other amounts due, CHARTERER must reimburse OWNER for its reasonable attorney's fees, unless CHARTERER's failure to pay was justified.

In the event of any dispute regarding any invoice, the undisputed portion of said invoice shall he paid and only the disputed portion shall remain unpaid pending the resolution of the dispute. If any vessel is lost, payment shall be made up to and including the date of the loss. If the time of loss is uncertain, then hire shall be payable up to and including the day such vessel was last heard from.

## ARTICLE 5 - USE OF VESSEL

CHARTERER agrees to restrict the use of each vessel solely to the lawful movement of its supplies, equipment (including CHARTERER's vessels whether owned or chartered), and other materials and personnel incidental to its operations in the inland and offshore waters of the U. S. Gulf Coast, Bay of Campeche, Caribbean Sea, Atlantic Ocean and in waters where the vessel can be navigated and always lie safely afloat at all stages of the tide. The whole of the vessel shall be at CHARTERER's disposal reserving proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, equipment, stores, and fuel. For reasons of safety, the vessel shall not be used for live diving (also known as live boating).

CHARTERER agrees to comply with all laws, regulations and the vessel's U. S. Coast Guard Certificate of Inspection (COI) affecting the marine carriage and discharge of Noxious Liquid Substances (NLS) in bulk. CHARTERER may not load or cause to be loaded on the vessel any bulk NLS not authorized by the vessel's COI, except and to the extent permitted by CHARTERER's National Pollution Discharge permit. No discharge of NLS residue into the sea is permitted; and CHARTERER agrees to indemnify, protect, defend and hold harmless OWNER, the vessel, its registered owner, its master and crew, and their respective underwriters from and against the results of any breach by CHARTERER of the aforesaid discharge prohibition. CHARTERER agrees to properly manifest all hazardous wastes and NLS wastes carried aboard the vessel and to comply with all paperwork requirements imposed by law as a result of such carriage.

The master of each vessel shall determine whether operations requested by the CHARTERER can safely be undertaken and whether his vessel is capable of undertaking or being employed to carry out the directions and orders of the CHARTERER. The master, although appointed by the OWNER, shall be under the general directions of the CHARTERER as regards employment of the vessel, agencies, or other arrangements, and shall not unreasonably refuse any request to undertake operations or carry out any order or direction specified by CHARTERER. From time to time, CHARTERER, shall furnish the master of the vessel with all-requisite instructions and sailing directions, and the master shall keep full and correct logs of the voyages and these shall be made available within a reasonable time upon the request of CHARTERER.  CHARTERER shall provide charts detailing the location of all undersea pipelines, installations and other equipment at any location where a vessel is to drop anchor, and shall be responsible for damage resulting from incorrect or inadequate information provided to Owner or a vessel's master or crew.

Notwithstanding anything to the contrary in this Master Time Charter Agreement it is agreed that if any operations, voyage, movement, activity or inactivity on the part of OWNER and/or the master is insisted upon by CHARTERER, its agent, employees, or representatives and undertaken by the master of the vessel under protest, on account of the opinion of the master that said operation, voyage, movement, activity, or inactivity is hazardous and likely to cause loss, damage or expense, or loss of life or personal injury, the responsibility for any such loss, damage or expense, loss of life or personal injury shall thereupon rest solely upon CHARTERER.

## ARTICLE 6 - NON-CREWMEMBER SUBSISTENCE

Food and bunking facilities, if any, for any personnel other than crewmembers shall be provided by OWNER, subject to reimbursement by CHARTERER, at the rate specified in the Short Form.

## ARTICLE 7 - DUTIES OF MASTER AND CREW

OWNER shall provide and pay for the master and crew of each vessel. The master shall prosecute the voyage with dispatch and shall render all reasonable assistance with the vessel's crew and equipment. The duties of the crew provided by OWNER shall be limited to the maintenance and navigation of the vessel, and local unions or labor regulations. OWNER shall not be required under any circumstances to load or discharge cargoes.

If the CHARTERER shall have reason to be dissatisfied with the conduct of the

Rev. Date:  05/03/10

master or officers, the OWNER shall, on receiving particulars of the complaint, investigate and, if necessary, make a change in the appointment or practices required to obtain the services contracted for herein.

## ARTICLE 8 - ADDITIONAL EQUIPMENT

CHARTERER may install additional equipment aboard each vessel reasonably necessary in connection with it operations, provided that CHARTERER shall obtain the written consent of OWNER before making any structural changes or modifications, and provided that said installation shall be approved by the American Bureau of Shipping and/or the United States Coast Guard, when applicable. All equipment installed by CHARTERER shall remain its property and shall be removed prior to redelivery; provided each vessel is restored to the same good order and condition as it was prior to the installation of equipment or structural change, all at CHARTERER's expense. Vessel shall remain on-hire at that rate set forth in the applicable Short Form during any period of said installation, removal and/or modifications.

## ARTICLE 9 - CHARTERER TO PROVIDE

CHARTERER agrees to and shall provide and/or pay for:

(a)    Necessary dunnage, uprights and shoring equipment for securing deck cargo; fuel, oil, and lubricants; fresh water; and cordage.

(b)    All permits, clearance expenses, agent fees, customs fees and duties (import or otherwise), assist vessels, pilotage fees, line handlers, wharfage, port charges, dockage, safe berths, watchmen, garbage disposal, waste oil disposal and all costs incident to any of the above, and any taxes except income taxes imposed by the country of registry of the vessel, imposed by any nation in which the vessel is required to work, agency fees and commissions incurred in connection with the assessment, levy or payment of any of the above, unless incurred by reason of delay or fault on the part of OWNER.

## ARTICLE 10 - OWNER'S INSURANCES

OWNER agrees at its sole cost and expense to procure and continuously maintain in full force and effect throughout the term of this Agreement, and with reliable insurance companies, the following insurance coverages:

(a)    Hull and Machinery Insurance, covering each vessel owned or chartered in connection with the operations under this Agreement, to the actual value of each vessel and its equipment.  If any vessel shall engage in towing operations, said insurance shall include full Towers Liability with the sistership clause unamended unless provided by Protection and Indemnity coverage.

(b)    Standard Protection and Indemnity Insurance, at least equal to the value of each vessel owned or chartered, (including Towers Liability, where applicable) and Excess Protection and Indemnity and Towers Liability, but the combined limit shall not be less than $1,000,000.

(c)    Commercial General Liability Insurance, with limits of liability for bodily injury and for property damages of not less than $1,000,000 any occurrence.  Such insurance shall include the following:

   (1)    Territorial extension to include the entire Gulf of Mexico without mileage limitation.
   (2)    *"In rem"* endorsement, stating that an action *"in rem"* shall be treated as a claim against the insured "*in personam*".
   (3)    Blanket Contractual Liability Coverage
   (4)    Deletion of the "watercraft" exclusion from the Liability Policy, including the contractual coverage.

(d)    Insurance to cover pollution clean-up liability to statutory limits and any liability for damages caused by pollution, with limits not less than $5,000,000.

(e)    Excess Liability Insurance, with limits of liability for bodily injury and property damage of not less than $10,000,000 any one occurrence.

All deductibles under the foregoing insurance shall be for the account of OWNER. All of the aforesaid policies shall name CHARTERER, its affiliates and subsidiaries, their respective underwriters, and working interest co-owners, in their capacity as Charterers of

Rev. Date:  05/03/10

the vessel, as Additional Assured and shall waive subrogation against such Additional Assured, but such naming and waiving shall only apply with respect to the obligations and risks assumed by OWNER in this Agreement. All of the aforesaid policies shall further provide that coverage provided by such policies is primary to any other insurance available to CHARTERER and without rights of contribution from any such other insurance available to CHARTERER. Such policies shall also provide CHARTERER receive not less than thirty (30) days notice of material change or cancellation of the aforesaid coverage's.

Prior to the commencement of any services by OWNER pursuant to this Agreement, OWNER shall secure and deliver to CHARTERER certificates in duplicate evidencing that the foregoing insurance coverage's are in full force and effect.

## ARTICLE 11 – CHARTERER'S INSURANCE

CHARTERER agrees at its sole cost and expense to procure and continuously maintain in full force and effect throughout the term of this Agreement, and with reliable insurance companies, the following insurance coverages:

(a)     Commercial General Liability Insurance, with limits of liability for bodily injury and for property damage of not less than $1,000,000 any occurrence.    Such insurance shall include the following:

(1)     Territorial extension to include the entire Gulf of Mexico without mileage limitation.
*(2)     "In rem" endorsement, stating that an action"in rem" shall be treated as a claim against the insured "in personam".*
(3)     Blanket Contractual Liability Coverage
(4)     Deletion of the "watercraft" for non-owned vessels from the liability policy, including the contractual coverage.

(b)    All Risks Cargo and Equipment Insurance, in the full amount of all cargo and equipment of Charterer and its affiliates, subsidiaries, and personnel carried aboard the vessel.

(c)  N/A

(d)    Insurance to cover pollution clean-up liability to statutory limits and any liability for damages caused by pollution, with limits not less than $5,000,000.

(e)    Excess Liability Insurance, with limits of liability for bodily injury and property damage of not less than $10,000,000 any one occurrence.

All deductibles under the foregoing insurances shall be for the account of CHARTERER.   The All Risks Cargo and Equipment Insurance, Commercial General Liability insurance policies and Excess Liability insurance shall name OWNER, the vessel, its owners, master, and crew, and their respective underwriters as Additional Assureds and shall Waive Subrogation against such Additional Assureds.  The Worker's Compensation and/or Employers' Liability policy shall Waive Subrogation against OWNER, the vessels, its owners, operators, master and crew, and their respective underwriters.   All of the aforesaid coverages shall provide that OWNER receive thirty (30) days written notice of material change or cancellation.   All of the aforesaid policies shall further provide that coverage provided by such policies are primary to any other insurance available to OWNER and without rights of contribution from any such other insurance available to OWNER.

Prior to the commencement of any services by OWNER pursuant to this Agreement, CHARTERER shall secure and deliver to OWNER Certificates in duplicate evidencing that the foregoing insurance coverages are in full force and effect.

## ARTICLE 12- INVALIDATION OF INSURANCE'S

It is the intention of the parties hereto that all risks, incidents, and claims, ordinarily and generally insurable in the trade, shall be, and are insured against under the insurance's provided for herein, or otherwise provided by the OWNER and CHARTERER of the vessel. It is agreed that should any act of CHARTERER vitiate or invalidate any of the aforesaid policies of insurance, then CHARTERER shall pay to OWNER all losses, damages, and expenses sustained by OWNER as a result therefore, and shall indemnify OWNER against all claims and demands which arise and which would otherwise have been covered by such insurance. It is further agreed that, should any act of OWNER vitiate or invalidate any of the aforesaid policies of insurance, OWNER shall pay to CHARTERER all losses, damages, and expenses sustained by CHARTERER as a result thereof and shall indemnify CHARTERER against all claims and demands which arise there from and which would otherwise have been covered by insurance.

## ARTICLE 13 - OWNER'S INDEMNITIES

Neither CHARTERER, its affiliates, subsidiaries, working interest, co-owners, their officers, employees, nor the underwriters of any of the foregoing (hereafter "CHARTERER INDEMNITEES) shall have any responsibility or liability for any claims, costs, expenses (including attorneys fees), actions, proceedings, suits, demands and liabilities whatsoever ~~involving damage to or loss of the vessel(s) chartered hereunder, or any of the property, equipment of OWNER, its subcontractors, or vessel owners/operators' providing services hereunder,~~ ~~or~~ for any injury, illness, disease, or death of employees, agents or representatives of OWNER, its subcontractors, or the vessel owners/operators providing services hereunder (hereafter "CLAIMS").  OWNER shall release, defend, indemnify, and hold harmless CHARTERER INDEMNITEES from any such CLAIMS, whether groundless or not, and whether caused in whole or in part by the negligence or faults of OWNER, its subcontractors, the vessel owners/operators providing services herein CHARTERER INDEMNITEES, the unseaworthiness of any vessels chartered herein, or by the equipment or property of OWNER, its subcontractors, the vessel owners/operators providing services herein or CHARTERER INDEMNITEES.  It is expressly understood that OWNER shall insure its obligations assumed under this paragraph.  It is expressly understood that the indemnity obligations of OWNER shall be considered primary to any obligation of any insurer of CHARTERER to afford coverage to OWNER in any policy of insurance of CHARTERER in which OWNER is named as an additional assured.

## ARTICLE 14- CHARTERER'S INDEMNITIES

Neither OWNER, its affiliates, subsidiaries, subcontractors, the vessel, her owners, operators, their officers, directors, employees, master and crew, nor the underwriters of any of the foregoing (hereafter "OWNER INDEMNITEES) shall have any responsibility or liability for any claims, costs, expenses (including attorney fees), actions, proceedings, suits, demands and liabilities whatsoever involving damage to or loss of ~~any property, drilling rigs, vessels,~~ cargo ~~and/or equipment~~ of CHARTERER, CHARTERER's other contractors and subcontractors, customers or invitees, or for any injury, illness, disease or death of employees, agents or representatives of CHARTERER, CHARTERER's contractors, subcontractors, customers or invitees (hereafter "CLAIMS").  CHARTERER shall release, defend, indemnify, and hold harmless OWNER INDEMNITEES from and against any such CLAIMS, whether groundless or not, and whether caused in whole or in part by the negligence or fault of CHARTERER, CHARTERER's contractors, subcontractors, customers or invitees; OWNER INDEMNITEES; or any other entity; or by the property or equipment of CHARTERER, CHARTERER's contractors, subcontractors, customers or invitees or by the equipment of OWNER INDEMNITEES, or the unseaworthiness of any vessel chartered hereunder.  It is expressly understood that the indemnity obligations of CHARTERER shall be considered primary to any obligation of any insurer of OWNER INDEMNITEES to afford coverage to CHARTERER in any policy of insurance of the OWNER INDEMNITEES in which CHARTERER is named as an additional assured.

## ARTICLE 15-CONSEQUENTIAL DAMAGES

Neither OWNER, the vessel, her owners, operators nor the underwriters of any of the foregoing nor CHARTERER and its underwriters shall be responsible or liable to the other for prospective profits or for special, indirect or consequential damages regardless of how such damages occur, including, but not limited to, loss of use, loss of profits, shut-in costs or expenses, well control costs, loss of production or the cost of insurance, regardless of whether such damages arise from or are caused in whole or in part by the fault, strict liability, sole or concurrent negligence of OWNER, the vessel, her owners, operators or CHARTERER or whether caused wholly or partially by the unseaworthiness of any vessels.

## ARTICLE 16 - LIENS

CHARTERER shall not create, incur or permit any liens to be imposed upon any vessel chartered under this Master Agreement. OWNER agrees to indemnify and hold harmless CHARTERER of and from all liens created and imposed on the vessel (except such liens as might arise out of the obligations imposed herein on CHARTERER) as a result of the manning, operating, victualing, maintaining, supplying, navigating and managing of the vessel. No party here to shall create, allow, consent to, or cause any lien as a result of this Agreement except for non-payment of invoices.

## ARTICLE 17- FORCE MAJEURE

Neither OWNER, CHARTERER, the vessel, or their owners, operators, managers, nor agents shall be liable for any loss, damage, or delay of whatsoever nature resulting from an Act of God, Force Majeure, enemy, strikes, labor disputes, hostilities, war, epidemic, quarantine, embargo, or for restraint of any government, rulers or people, or other causes beyond the control of the parties hereto. It is understood and agreed that unusual or inclement weather preventing the operation of the vessel, while the vessel is otherwise



Rev. Date:  05/03/10

available for service, shall not interrupt the vessel's charter lime.

## ARTICLE 18 - SALVAGE

All salvage and salvage towage shall, after payment of out-of-pocket expenses, awards to the master and crew, and charter hire due OWNER during such salvage efforts, be divided fifty percent (50%) to CHARTERER and fifty (50%) to OWNER.

## ARTICLE 19 - ASSIGNMENT

Neither OWNER nor CHARTERER shall assign this Master Agreement without the prior written consent of the other, which consent shall not be unreasonably withheld. However, no such assignment shall relieve the assigning party from any of its obligations hereunder.

## ARTICLE 20 – FAILURE TO PERFORM

If, at any time after delivery to CHARTERER, CHARTERER fails to perform any of its duties or obligations imposed under this Master Agreement or any Short Form, or if CHARTERER is dissolved or adjudged as bankrupt or has a petition in bankruptcy filed against it, or makes a general assignment for the benefit of creditors, or if a receiver is appointed for CHARTER, OWNER may without prejudice to any other rights which it may have under this Master Agreement or any Short Form, withdraw and retake any vessel, wherever the same be found, without prior demand and without legal process, and for that purpose may enter upon any dock, pier, or other premises where any vessel may be found and take possession thereof. In the event of CHARTERER's failure to timely redeliver each vessel, CHARTERER shall indemnify and hold OWNER harmless from and against any and all liability, cost, and expense incurred by the OWNER in retaking and obtaining possession of each vessel.

## ARTICLE 21 - NATURE OF CHARTER

Nothing herein contained shall be construed as creating a demise of the vessel to the CHARTERER, nor shall this Agreement apply to the bareboat charter of any vessel from OWNER by CHARTERER. If a bareboat charter is desired for any vessel, such will be covered by a separate agreement.

## ARTICLE 22 – ASSIGNMENT

CHARTERER may not assign this Master Agreement or any Short Form without prior written consent of OWNER. OWNER may assign this Master Agreement and any Short Form to a successor to all or part of its business.

## ARTICLE 23 - NOTICES

The address of the OWNER for sending notices under this Master Agreement is:

OFFSHORE TOWING, INC.
P.O. BOX 1463
LAROSE, LA 70373

The address of the CHARTERER for sending invoices and notices under this Master Agreement is:

WORK CAT TRANS GULF, LLC
821 SOUTH NEWPORT AVE.
TAMPA, FL 33606

Any notices provided for herein shall be deemed to have been given at the time of mailing when sent by registered mail to the recipient at the address hereinabove stated.

## ARTICLE 24 - LAW

Rev. Date: 05/03/10

This Master Agreement shall be construed in accordance with the admiralty and maritime laws of the United States of America. Where maritime law does not apply the laws of the State of Louisiana will govern.

## ARTICLE 25 - HEADINGS

The preceding headings are for identification purposes only and are not intended to delineate the obligations or rights of the parties to this Agreement.

## ARTICLE 26 - SEVERABILITY

The provisions of this Agreement are separable and severable. If any provision, item or application of this Agreement shall be deemed invalid in whole or in part, such invalidity shall not affect other provisions, items or applications of this Agreement which can be given effect without the invalid provision, item or application.

IN WITNESS WHEREOF, the parties hereto have caused this Master Agreement to be executed by their duly authorized representatives, in duplicate originals, as of the day and year first above written.

WITNESSES:                                OWNER:

                                          OFFSHORE TOWING, INC.

_____         BY: _____

_____         TITLE: _____

WITNESSES:                                CHARTERER:

                                          WORK CAT TRANS GULF, LLC

_____         BY: _____

_____         TITLE: _COO/VP Ops_

Rev. Date: 05/03/10

Exhibit B

| Vendor ID | Company Name | Date Paid | Payment Amount | Bank Name | Payment Method |
|---|---|---|---|---|---|
| OTI Enterprise | Offshore Towing, Inc. | 02/18/2021 | $28,000.00 | Bank of Tampa | ACH |
| OTI Enterprise | Offshore Towing, Inc. | 03/06/2021 | $17,940.00 | Bank of Tampa | ACH |
| OTI Enterprise | Offshore Towing, Inc. | 03/18/2021 | $24,443.00 | Bank of Tampa | ACH |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  | **3 Transactions, $70,383.00** |  |  |  |  |
|  |  |  |  |  |  |